**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| HOWARD RIMSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No. 4:18-cv-00743-BP** |
| DOLGENCORP, LLC D/B/A DOLLAR | ) | |
| GENERAL, | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. Pro. 56.01, Plaintiff provides the following Suggestions in

Opposition to Defendant's Motion for Summary Judgment.

**TABLE OF CONTENTS**

I.   Index of Exhibits to Plaintiff's Suggestions in Opposition to Defendant's
     Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. Plaintiff's Responses to Defendant's Statement of Allegedly Uncontroverted
     Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  Plaintiff's Statements of Additional Material Facts for Jury Resolution . . . . . . . . . . . 28

     A.  Coverage of Dollar General Retail Stores Under the MHRA . . . . . . . . . . . . . . . . . 28

     B.  Duties and Responsibilities of Lead Sales Cashier Tammy McCormick . . . . . . . . 29

     C.  Repeated Prior and Subsequent Racial Slurs by McCormick other
         than September 17, 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     D.  Ineffective Dollar General Policies on Discrimination Against Customers . . . . . . 34

     E.  Lack of Full Investigation by Dollar General of Plaintiff's Complaint . . . . . . . . . . 36

     F.  Failure to Preserve Records and Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

     G.  Termination of Employment of McCormick for Non-Related Reasons . . . . . . . . . 37

V.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

   A.  Retail Stores are Places of Public Accommodation under the Missouri
       Human Rights Act and Therefore, Summary Judgment Should Be Denied
       Under Count 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

   B.   Dollar General is Not Entitled to Summary Judgment on Count II Because
        Plaintiff Satisfies the Elements of his Claim under 42 U.S.C. § 1981 . . . . . . . . 46

   C.  Dollar General is Not Entitled to Summary Judgment on Plaintiff's
       Missouri's Merchandise Practices Act Claim under Count III . . . . . . . . . . . . . . 50

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

## I.
## INDEX OF EXHIBITS TO PLAINTIFF'S SUGGESTIONS

**A.  Deposition Transcripts (in alphabetical order)**

   1.  MacGregor, David (individual and Corporate Representative)

   2.  McCormick, Tammy

   3.  Ray, Imari

   4.  Rimson, Howard (Plaintiff)

   5.  Schlosser, Karen

   6.  Sharp, Dale

   7.  Snow, Nick (Corporate Representative)

   8.  Svebek, Trish (Corporate Representative)

   9.  Tucker, Juanita

   10.  Watson, Jennifer (Corporate Representative)

   11.  Young, Gregory

**B.  Deposition Exhibits (in numerical order)**

   12.  Deposition Exhibit 1 – Receipt from 24 Dollar General Store (P000001)

13.     Deposition Exhibit 10 – Employee Schedule – 09/16/17-09/22/17 (DG RIMSON 000001)

14.     Deposition Exhibit 14 – 11/07/17 Letter – Gockel to Dolgencorp, re: preservation of records, with attached MCHR Complaint and Dolgencorp email response (DG RIMSON 000035-000040)

15.     Deposition Exhibit 15 – Undated Handwritten Notes of Dale Sharp, re: customer complaint (DG RIMSON 000029-000031)

16.     Deposition Exhibit 20 – Thumb Drive of Recording, being submitted manually to Court

17.     Deposition Exhibit 21 – Sept. 3-4 – Dollar General Ad (DG RIMSON 000049)

18.     Deposition Exhibit 23 – 10/01/17 Handwritten Notes of McCormick re: customer complaint (DG RIMSON 000062-000063)

19.     Deposition Exhibit 24 – Progressive Counseling Form – Tammy McCormick, with attached Dollar General Anti-discrimination and Harassment Policy (DG RIMSON 000032-000034)

20.     Deposition Exhibit 27 – Job Description – Lead Sales Associate (DG RIMSON 000076-000077)

21.     Deposition Exhibit 29 – Dollar General Ads (DG RIMSON 000041-000061)

22.     Deposition Exhibit 30 – Chart re: charcoal – DG RIMSON 000028)

23.     Deposition Exhibit 34 – Records Management Policy – Dollar General (DG RIMSON 000074-000075)

24.     Deposition Exhibit 35 – Planogram of Kingsford Charcoal (DG RIMSON 00369)

25.     Deposition Exhibit 35A – Planogram of Kingsford Charcoal, with handwritten notations (DG RIMSON 000369)

26.     Deposition Exhibit 36 – Anti-Discrimination and Harassment Policy for Tammy McCormick (DG RIMSON 000312-000313

27.     Deposition Exhibit 37 – Dollar General Handbook – STAR (DG RIMSON 00144-000225)

28.     Deposition Exhibit 38 – Dollar General Handbook – Employment Law and Related Policies Overview (DG RIMSON 000081-000139)

29.    Deposition Exhibit 39 – Dollar General Handbook – Serving Customers – A Store Manager Training Course (DG RIMSON 000226-000307)

30.    Deposition Exhibit 40 – Personnel File – Tammy McCormick (DG RIMSON 000308-000338; 000367)

31.    Deposition Exhibit 43 – Employee Termination Sheet – Tammy McCormick

**C.    Non-Deposition Exhibits and Declarations**

32.    Exhibit A – MCHR Poster on Public Accommodations, available at https://labor.mo.gov/sites/labor/files/pubs_forms/MCHR-7-AI.pdf;

33.    Exhibit B – Transcript of Recording marked as Deposition Exhibit 20

34.    Exhibit C – Mo. Rev. Stat. § 213.010(12) (1986) (L. 1986, S.B. No. 513, § A)

35.    Declaration of Howard Rimson and Declaration Exhibit A (photo)

36.    Declaration of Marie L. Gockel

## II.

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Antle v. Reynolds*, 15 S.W.3d 762, 766 (Mo. App. 2000)………………………………… 58

*Bratton v. Hershey Company*,
    No. 2:16-cv-4322-C-NKL, 2018 WL 934899 (W.D. Mo. Feb. 16, 2018)………… 55

*Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 577-79 (6th Cir. 2013)………... 16

*Conway v. Citi Mortgage, Inc*, 438 S.W.3d 410, 414 (Mo. Banc 2014)…………... 51, 54, 55

*Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862 (6th Cir. 2001)………………….……... 47

*Doe by and through Subia v. Kansas City, Missouri School District*,
    372 S.W.3d 43, 48-50 (Mo. App. 2012)…………………………….. 40, 42, 43, 44, 45

*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 477, 126 S.Ct. 1246 (2006)………….. 47

*Edmonds v. Hough*, 344 S.W.3d 219 (Mo. App. E.D. 2011) ………………………………51

*Green v. Dillard's, Inc.*, 483 F.3d 533 (8th Cir. 2007)………………………………….47

*Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469, 477 (8th Cir. 2009)………........ 41, 44, 45, 47

*Gregory v. Dillard's, Inc.*,
Case No. 02-04157-CV-C-SOW, 2005 WL 1719960 *6-7 (W.D.Mo. July 22, 2005………..44

*Grabinski v. Blue Springs Ford Sales, Inc.*, 136 F.3d 565 (8th Cir. 1998)…………………58

*Hale v. Basin Motor Company*, 795 P.2d 1006 (N.M. 1990) ……………………………... 58

*Hess v. Chase Manhattan Bank, U.S.A., N.A.*, 220 S.W.3d 758, 773 (Mo. Banc 2007)……51

*Hinchcliffe v. American Motors Corporation*, 440 A.2d 810, 815 (Conn 1981)…………...57

*Jackson v. Charlie's Chevrolet, Inc.*, 664 S.W.2d 675 (Mo. App. 1984) …………………55

*Johnson Electric Company, Inc. v. Salce Contracting Associates, Inc.*,
    805 A.2d 735, 743 (Conn. App. 2002)……………………………………………… 57

*Kirt v. Fashion Bug #3253*, 479 F.Supp.2d 938 (N.D. Iowa 2007)…………………….49, 50

*Lewellen v. Franklin*, 441 S.W.3d 136, 142 (Mo. Banc 2014)……………………………..57

*Middleton v. Missouri Dep't of Corrections*, 278 S.W.3d 193, 196(Mo. Banc 2009)…….. 44

*Missouri Commission on Human Rights v. Red Dragon Restaurant, Inc.*,
    991 S.W.2d 161 (Mo. App. W.D. 1999)……………………………………42, 44, 45

*Missouri Property & Casualty Insurance Guaranty Association v. Pott Industries*,
    971 S.W.2d 302, 305 (Mo. Banc 1998)…………………………………………43

*Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. App. 2016)……………....56

*Pollock v. Wetterau Food Distribution Group*,
    11 S.W.3d 754, 766 (Mo. App. E.D. 2000)………………………………………....41

*Ports Petroleum Company, Inc. of Ohio v. Nixon*,
    37 S.W.3d 237, 240 (Mo. Banc 2001)…………………………………51, 52, 54, 58

*R.M.A. v. Blue Springs R-IV School District*,
    568 S.W.3d 420, 429-30 (Mo. Banc 2019)…………………………..42, 43, 44, 45

*State ex rel. City of Kirkwood v. Smith*, 210 S.W.2d 46, 48 (Mo. Banc. 1948) ……......45, 46

*State ex rel Danforth v. Independence Dodge, Inc.*,
    494 S.W.2d 362, 368(Mo. App. 1973)………………………………………… 57

*State ex rel. Nixon v. Estes*, 108 S.W.3d 795, 799-801 (Mo. App. 2003)………………… 52

*State ex rel. Webster v. Areaco Investment Co.*,
    756 S.W.2d 633, 637(Mo. App. 1988)………………………………………… 57

*State of Missouri ex rel. Washington University v. Richardson*,
    396 S.W.3d 387, 391-96 (Mo. App. 2013) …………………………40, 42, 43, 44, 45

*State v. Polley*, 2 S.W.3d 887, 892 (Mo. App. 1999) …………………………………..52, 53

*State v. Shaw*, 847 S.W.2d 768, 775 (Mo. Banc. 1993)……………………………… 51, 52

*Williams v. Lindenwood University*, 288 F.3d 349, 355 (8th Cir. 2002)…………………...48

*Withers v. Dick's Sporting Goods, Inc.*,636 F.3d 958, 962 (8th Cir. 2011)……………… 47

*Xiaohong Zhang v. Home Depot USA, Inc.*,
    Case No. 4:17-CV-02477 JAR, 2017 WL 6039549, #2 (E.D. Mo. Dec. 6, 2017)… 45

## Federal Statutes

42 U.S.C. § 1981…………………………………………………………………..46, 47

42 U.S.C. § 1983…………………………………………………………………………..45, 49

42 U.S.C. § 2000a…………………………………………………………………………40, 45

**Missouri Statutes**

Mo. Rev. Stat. § 213.010(15)…………………………………………………………...39, 40

Mo. Rev. Stat. § 213.010(16) ………………………………………… 39, 40, 41, 42, 43, 46

Mo. Rev. Stat. § 213.065 (2017)……………………………………..39, 40, 41, 42, 43, 44, 45, 46

Mo. Rev. Stat. § 407.010(1)……………………………………………………………...50, 51, 52

Mo. Rev. Stat. § 407.020………………………………………………………………..50, 51, 53, 54

Mo. Rev. Stat. § 407.025.1………………………………………………………………...51, 56

Mo. Rev. Stat. § 213.010(12) (1986) (L. 1986, S.B. No. 513, § A) ………………………46

Fair Employment Practices Act, § 296.010…………………………………………………...46

Fair Housing Act, Chapter 213…………………………………………………………………46

Public Accommodation Act, Chapter 314……………………………………………………46

**Other Authorities**

Fed. R. Evid. 807………………………………………………………………………... 16

C.S.R. § 60-3.010(3)…………………………………………………………………………41

15 C.S.R. § 60.0.020(1) and (2) ……………………………………………………………53

15 C.S.R § 60-7.010(1)(A)………………………………………………………………… 52

15 C.S.R. § 60-9.040……………………………………………………………………... 53, 54

Missouri Approved Instruction 39.01 (Committee Comment A) (2016 Revision)
    (7th ed.) …………………………………………………………………………………51

III. **PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF ALLEGEDLY UNCONTROVERTED FACTS DEMONSTRATING EXISTENCE OF DISPUTED FACTS FOR JURY RESOLUTION**

Pursuant to Fed. R. Civ. Pro. 56.01 and Local Rule 56.1, Plaintiff responds as follows to Dollar General's statement of uncontroverted material facts ("DSOF") and in Section IV, *infra,* includes Plaintiff's Additional Statement of Material Facts ("PSOF").

1.      Dollar General is a "small box" discount retailer of quality consumer goods.  Ex. 1, Declaration of David MacGregor, ¶ 3.

**RESPONSE:**  Uncontroverted, except to add the following material fact:

1a.      Dollar General is a retail store that offers and holds out to the general public goods for sale.  Ex 10 - Corporate Representative Deposition (Jennifer Watson) 37:25-38:10; Ex 29 - Deposition Exhibit 39, bate-stamped page number 000279; Defendant's Answer, ¶ 3 [Court Document No. 6].

2.      Dollar General maintains policies prohibiting discrimination of any kind against its customers.  Ex. 1, MacGregor Decl. at ¶ 4.

**RESPONSE:**  Objection as conclusory and lacking in foundation, as MacGregor fails to state what "policies" he is referring to nor the alleged substance of its "policies," and therefore, this statement provides no facts as required by Fed. R. Civ. Pro. 56.01.  With respect to the specifics of Dollar General policies, *see* Section IV.D., ¶¶ 31-39, *infra.*

3.      On September 17, 2017, around 5:20 in the evening, Plaintiff went to the Dollar General store located at 16659 East 23rd St. South, near 291 Highway and Gudgell Road (the "East 23rd Street store"), in Independence, Missouri. Ex. 2, Plaintiff's Dep. at 13-14.

**RESPONSE:**  Uncontroverted, except to add the material facts:

3a.      On September 17, 2017, at the Dollar General store located at 16659 East 23rd St. South in Independence, Missouri (referred to as Store 2605), Lead Sales Associate McCormick

was in the store by herself for forty-five minutes from 5:00 p.m. after the departure of Assistant Store Manager Karen Schlosser at 5:00 p.m., until 5:45 p.m. when Sales Associate Steven Sloan came to work. Ex 2 - McCormick Depo 25:3-12; Ex 11 - Young Depo 27:16-19; 28:4-10; 30:10-19; Ex 13 - Deposition Exhibit 10.

3b. Dollar General Store Manager Dale Sharp described that it was typical that the highest position in the store for some period of the day would be the Lead Sales Associate, during which the Lead Sales Associate would have the same responsibilities as the Store Manager overseeing the entire operation of the store. Ex 6 - Sharp Depo 25:18-26:15. Lead Sales Associate McCormick was considered "entry level management" and was a "key carrier." Ex 11 - Young Depo 31:23-33:23. *See also* Section IV.B, ¶¶ 3-11, *infra*.

4. Plaintiff went to the East 23rd Street store to purchase charcoal and lighter fluid. Ex. 2, Pltf's Dep. at 20.

**RESPONSE:** Uncontroverted that Plaintiff went to the Dollar General Store 2605 to purchase charcoal and he believes lighter fluid, for a barbecue at his brother's house to celebrate his birthday. Plaintiff was headed to his brother's house and the Dollar General Store was the most convenient stop on his way there. Ex 4 - Rimson Depo 20:7-21:1.

5. Dollar General sells more than one brand of charcoal, as well as different size bags of charcoal. Ex. 3, Declaration of Nick Snow, ¶ 3.

**RESPONSE:** Plaintiff does not dispute that Dollar General sells more than one brand and size of charcoal, but asserts that 1) more than just the Kingsford brand charcoal was displayed on a "grill rack" located outside Store 2605 on September 17, 2017. Ex 2 - McCormick Depo 49:24-50:10; Ex 6 - Sharp Depo 97:2-12; Ex 3 - Ray Depo 61:3-64:7; Ex 35 - Plaintiff Declaration, ¶¶ 1-6; 2) that Dollar General Store 2605 taped a $5, 3 x 3 sign in black and yellow Dollar General

logo brand colors, to the outside grill rack, on September 17, 2017 (see ¶¶ 5a-5e, infra); and 3) Store 2605's practice conflicted with the "planogram" of Dollar General's corporate offices for barbecue grill racks (see ¶¶ 5a-5l, *infra*). Plaintiff adds the following material facts in support of these statements:

5a.     At the Dollar General Store 2605 on September 17, 2017, there was a barbecue grill rack located outside of the store that displayed **both** the Dollar General and Kingsford brands of Charcoal. McCormick described the charcoal grill layout on September 17, 2017 as including both Kingsford and the Dollar General brand, with a yellow sign that stated, $5. McCormick claimed the $5 sign was by the Dollar General Brand but not on the Kingsford brand. Ex 2 - McCormick Depo 49:24-50:10. Store Manager Sharp admitted sometimes both Kingsford and the Dollar General brands of charcoal were both placed on the same grill rack. Ex 6 - Sharp Depo 97:2-12. Sharp also admitted that the grill rack at Store 2605 did not include lighter fluid. Ex 6 - Sharp Depo 36:19-37:12; 38:8-24.

5b.     The grill rack could hold three types of charcoal, so usually it displayed Kingsford on top, Dollar General in the middle and a different brand at the bottom. It was every employee's responsibility to keep the signs posted on the grill rack. Ex 3 - Ray Depo 61:3– 64:7.

5c.     On September 17, 2017, Plaintiff observed the grill rack and the presence of a "big yellow 5" colored sign advertising in the Dollar General black and yellow colors, stating only "$5," sitting on top of the rack, with charcoal located below on the grill rack, on the sidewalk outside of the Dollar General store 2605. Ex 4 - Plaintiff Depo 21:24-22:16; 27:17-28:10; 33:7-10.

5d.     The display of both Kingsford and the Dollar General Brand (or three different charcoal brands) at Store 2605 at its outside grill rack was contrary to the "plan" set forth in the applicable "planogram" for the week of September 17, 2017 by Dollar General's corporate offices.

The "planogram" for the week that included September 17, 2017, marked as Deposition Exhibits 35 and 35A, instructed that only Kingsford charcoal was 'planned" to be sold on the grill rack, not two or even three different brands of charcoal as Store 2605 displayed and sold on the grill rack. Ex 7 - Corporate Representative Deposition, Nicholas Snow, Snow Depo 26:9-13; 42:19-23.

      5e.     According to the Dollar General's corporate offices, there was no charcoal "planned" per the "planogram" applicable to Store 2605's outside grill rack, that was to be offered for sale for the price of $5 on September 17, 2017. Ex 7 - Snow Depo 24:9-12, 22-26:13; 34:24-35:3.

      5f.     Dollar General's corporate offices authorize the use of pre-printed, black and yellow price tags that read, "5" or "$5," with no additional information on them for posting products; however, this pre-printed signage was not intended by the corporate offices to be used to post prices for products on the grill rack. Ex 7 - Snow Depo 37:17-24, 38:10-12.

      5g.     On September 16, 2017, when she closed, Sales Associate Ray took all of the outside racks back inside the front of the store, to be taken back out the next day. Sometimes the signs became missing from the racks. If the signs weren't correct, the customers would ask the price of the charcoal. The same racks were used year-round and different products and price-tags were placed on the racks. Ex 3 - Ray Depo 55:15–56:25.

      5h.     If the tags were lost they were replaced from a large cardboard box of tags that were used for anything on sale. Dollar General Store 2605 used three-by-three tags showing only prices, available from a box in the manager's office. The tags were yellow with black numbers on them, such as 1, 1.50, 2, 2.25, including a price tag for $5. The store lingo used for this tag was "Go get a price." The tags were paper so they were taped on the outside rack. The tags could be

used interchangeably for different products. Ex 3 - Ray Depo 57:1–58:25; Ex 5 - Schlosser Depo 16:7-17; 16:20-19:15.

5i.     Customers could get confused because the charcoal bags were different sizes.  The 7.7 pound bag might be on sale but the 5.2 pound bag would not be on sale.  Sometimes products would not ring through at the sale price and the computer didn't alert the employee.  If a customer questioned the price, McCormick would fix it.  The employees were trained on what to do when a customer questioned the price, such as if a sale tag was still up when the sale was over the previous day.  They would only charge them the sale price because otherwise it would be false advertising.  Part of this practice involved checking the outside rack to see what the posted price was for the product.  Ex 3 - Ray Depo 64:8–67:25.

5j.     Regarding prices on the outside racks, the weather could cause the price tag to disappear and sometimes customers ripped them off.   Ex 3 - Ray Depo 68:1–69:3.

5k.     In contrast to the practice described by McCormick and Ray at Store 2605, Dollar General's corporate office states the pre-printed signage with the price points was not supposed to be used for posting on the grill rack as "planogram-controlled items are driven and have labels available to the stores to print associated with that planogram." Ex 7 - Snow Depo 30:14-31:11.

5l.     The planogram marked as Deposition Exhibit 35 and 35a claiming to show the planned display for charcoal products for Store 2605 does not match the charcoal products Plaintiff observed on September 17, 2017 at Store 2605 on the outside grill rack, with the differences including a) there was no "Kingsford" sign whatsoever at the top of the display Plaintiff observed on September 17, 2017; b) On September 17, 2017, there was more than one brand of charcoal – more than just the Kingsford charcoal brand displayed, as the Dollar General brand also was also displayed; c) there was a $5 black and yellow sign on top of the display Plaintiff saw at Dollar

General 2605 on September 17, 2017.  Ex 35 - Plaintiff Declaration, ¶ 4.  *See also* Ex 2 - McCormick Depo 49:24-50:10; Ex 6 - Sharp Depo 97:2-12.

6.  The prices of charcoal sold by Dollar General vary based on the brand and weight of the bag and whether the product is being sold temporarily at a discounted price.  Ex. 3, Snow Decl. at ¶ 4.

**RESPONSE:**  Unconverted as a general statement, but see also paragraphs 5.a through 5.l, *supra.*

7.  On September 17, 2017, the East 23rd Street store had multiple brands of charcoal and different size bags that were for sale at varying prices.  Ex. 3, Snow Decl. at ¶ 5.

**RESPONSE:**  Uncontroverted as a general statement, but Plaintiff points out the facts set forth as ¶¶ 5.a through 5.l *supra,* as the material facts related to this lawsuit.

8.  On September 17, 2017, there were bags of charcoal for sale located on a rack set up just outside the front entrance of the store.  Ex. 2, Pltf's Dep. at 25.

**RESPONSE:**  Controverted to the extent that the statement is not sufficiently specific.  Plaintiff states:

8a.  Store 2605 had both bags of Kingsford and the cheaper Dollar Brand charcoal displayed to the general public for sale on a grill rack set up just outside the front entrance of the store, with a pre-printed sign stating $5 next to the Kingsford brand, contrary to the Planogram set up for the week that included  September 17, 2017.  See Section II, ¶¶ 5.a through 5.l, *supra.*

9.  On September 17, 2017, at the East 23rd Street store, Dollar General did not have any charcoal product planned for sale at the price of $5.00 on the grill rack set up at the store, but it did have 15.4 pound bags of Kingsford charcoal planned for sale for $10.00 on the grill rack.  Ex. 3, Snow Decl. at ¶ 6.

**RESPONSE:** Controverted, based on the following:

9a.     On September 17, 2017, Plaintiff did not select the largest size of charcoal on the charcoal rack (15.4 lbs.) as implied or claimed in paragraph 9, but selected a bag of Kingsford charcoal between 4 and 5 lbs. in weight, basically the size for a one time use as he was bringing charcoal to a family member's house to use that evening.  Ex 35 - Plaintiff Declaration, ¶¶ 1-3. On September 17, 2017, Plaintiff observed the grill rack and the presence of a "big yellow 5" colored sign advertising in the Dollar General black and yellow colors, stating only "$5," sitting on top of the rack, with charcoal located below on the grill rack, on the sidewalk outside of the Dollar General store 2605.  Ex 4 - Plaintiff Depo 21:24-22:16; 27:17-28:10; 33:7-10.

9b.     On September 17, 2017, Dollar General Store 2605 displayed on its outside grill rack both Kingsford and other Dollar General Brand charcoal and had charcoal advertised for sale with a black and yellow $5 sign on top of its outside grill rack, below the Kingsford charcoal smallest size.  *See* ¶¶ III.5a-5c, 5g-5h, *supra.*

9c.     Snow's testimony is lacking in foundation as to the basis for his assertion in ¶ 6 of his Declaration.  Snow does not explain the basis of how he would claim to be able to state under oath, as a Dollar General executive at its Tennessee corporate offices, what items were actually on display at Store 2605's outside grill rack, for Plaintiff to view on September 17, 2017, as opposed to the carefully chosen words of Dollar General as to what was "planned" for the sale of charcoal. In only referring to what was claimed to have been "planned" for the sale of charcoal, Snow does not provide any foundation to understand the basis of his claimed knowledge of what would have been "planned."   Being the Senior Director of Pricing does not automatically equate with knowledge of the day to day operations of each of the 8,000 Dollar General retail stores.  Ex 29 - Deposition Exhibit 39, bate-stamped page 000279.

9d.     Contrary to the corporate representative's testimony that the planogram for the grill rack included only Kingsford charcoal and lighter fluid, Exhibit 35, the grill rack at Store 2605 could hold three types of charcoal, so usually it was Kingsford on top, Dollar General in the middle and a different brand at the bottom.  It was every employee's responsibility to keep the signs posted on the grill rack.  If the items outside were not posted in the paper as on sale the employee would inform the customer before bringing it up, saying for instance, "This is $5 instead of $5.95."  Ex 3 - Ray Depo 61:3–64:7.

9e.     On September 17, 2017, Dollar General had pre-printed signs in the Dollar General black and yellow brand colors that said $5 that the store used for multiple purposes including for its outside grill rack.  Ex 3 - Ray Depo 57:1– 58:25; Ex 5 - Schlosser Depo 16:7-17; 16:20-19:15; Ex 2 - McCormick Depo 49:24-50:10; Ex 35 - Plaintiff Declaration, ¶ 4.

9f.     On September 17, 2017, even though it used the $5 sign (*see* ¶ 9.b and 9.e, *supra*), Dollar General did not actually have any bags of charcoal that it ***intended*** to charge to a customer at the price of $5, for any size or brand, on its outside grill rack.  Ex 7 - Snow Depo 24:9-12; 24:22-26:13; 34:24-35:3.

9g.     Contrary to the Corporate Representative's testimony, McCormick stated that the Dollar General brand was on sale for $5 on September 17, 2017.  Ex 2 - McCormick Depo 109:9-20.

10.     On September 17, 2017, Plaintiff walked into the store and asked an employee named Tammy, who was at the cash register, where the charcoal and lighter fluid was located.  Ex. 2, Pltf's Dep. at 24-25.

**RESPONSE:**  Undisputed that Plaintiff asked McCormick, who was at the cash register, for the location of the charcoal and lighter fluid and that this was their first encounter.  Ex 4 - Plaintiff Depo 24:7-10.  Plaintiff further states:

10a.    Lead Sales Associate Tammy McCormick, the sole Dollar General employee present at Store 2605 from 5:00 p.m. to 5:45 p.m., approximately one hour after Plaintiff left Dollar General Store 2605 on September 17, 2017, expressed the following in a recorded conversation: McCormick admits to believing (while "not trying to be racist or anything") that "a lot of these people," referring to not all but most Blacks, come into Dollar General and throw "their attitude around, and we got to stand our grounds."  McCormick admits having the belief that most black customers of Dollar General have "attitudes," which in her mind means most Black customers "are looking for some reason to fight with somebody," and that such attitudes "instantly give her that same "attitude." Ex 16 - Deposition Exhibit 20; Ex 2 - McCormick Depo 37:13-39:10; Ex 33 - Exhibit B, lines 68-74.[1]   When McCormick stated in the recorded conversation that Blacks have "attitudes," she meant that they are "basically looking to find some reason to fight with somebody." Ex 2 - McCormick Depo 40:1-25.  McCormick claims "she had attitudes being throwed at her," the majority of which "pretty much" came from Black customers and "That's all I ever deal with in here."  Ex 33 - Exhibit B, lines 80-82.  McCormick allows for the possibility that white people

---

[1]     During her deposition, the recording marked as Deposition Exhibit 20 was played in full and after hearing it, McCormick identified the voices in the recording that was played.  Ex 2- McCormick Depo 37:13-39:10. The same recording was played in the depositions of Juanita Tucker and District Manager Gregory.  Tucker identified the recording as one the one she made. Ex. 9-Tucker Depo 26:13-27:8; 29:3-:13.  Young confirmed the content of the recording to be what he had heard when Juanita Tucker, Plaintiff's mother, played the tape for Young on her cell phone.  Ex 11-Young Depo 57:20-58:25, and the Deposition of Juanita Tucker.  Ex 9 – Tucker Depo 29:3-26:13-27:8. The recording has been provided to the court manually as Ex 16-Deposition Exhibit 20.  The transcript of the recording has been prepared by Plaintiff's counsel and marked as Ex 33-Exhibit B to these Suggestions.  The transcript is offered pursuant to Fed. R. Evid 807, *see, e.g., Brumley v. Albert E. Brumley & Sons, Inc,* 727 F.3d 574, 577-79 (6th Cir. 2013) or alternative, as a demonstrative aid.  For ease of reference, the lines of the transcript Ex 33-Exhibit B have been numbered consecutively and are cited accordingly.

also have attitudes at times, but according to her, these are white people who come into the store and act like African Americans. Ex 2 - McCormick Depo 40:1-22.

10b.    McCormick claims she "always greeted everybody coming in," since the cash registers are at the front of the store, and repeated she "always greets[s] all [her] customers." Ex 2 - McCormick Depo 38:17-19; 84:25-85:1. McCormick, however, admits to failing to greet Plaintiff when he entered Store 2605 on September 17, 2017. Ex 2 - McCormick Depo 47:8-16; 49:5-6.

10c.    Dollar General's policy identified in its corporate representative deposition as part of its policies on non-discrimination against customers requires the store manager to train employees that all customers be greeted by Dollar General employees. Ex 10 - Watson Depo 40:1-41:1; Ex 29 - Deposition Exhibit 39, DGRimson 240 and is part of the Customer Service Training, as set forth in paragraph 10d, *supra.*. The purpose of Dollar General's expectation of its employees to greet customers when they enter the store is for Dollar General "to acknowledge them." Ex 10 - Watson Depo 40:21-41:1.

10d.    Dollar General's policy identified in its corporate representative deposition as part of its policies on non-discrimination against customers, entitled STAR Training, speaks to customer service expectations of Dollar General employees:

- STAR stands for Smile, Thank, Assist, Resolve and is considered part of the job (150, 159)

- Interact with the customer in a positive manner (156)

- Specific customer service techniques include "Immediately welcome and greet customers," as customers form their first impression within 10 seconds of walking

into a Dollar General store, and the directive of welcoming and greeting customers is mentioned repeatedly (161-66, 176)

- Assisting customers include when a customer asks for assistance you should always walk the customer to the merchandise. (188, 195)

- Strive for customer satisfaction with a quick and easy checkout and making sure the customer leaves the store satisfied (197-98)

- If a customer expresses any dissatisfaction, make decisions that keep the customer top of mind. Take action to do the right thing! (202, 207)

- Calling the Manager on Duty to help resolve customer concerns is doing "the right thing" and being "the hero." (207)

- The customer is to be thanked and invited back. (177-83)

Ex 10 - Watson Depo 19:11-21:13; Ex 27 - Deposition Exhibit 37, DGRimson bate-stamped page citations listed above. All employees at Dollar General take the Computer-Based "STAR" Customer Service training at the start of their employment but do not repeat it if promoted. Ex 10 - Watson Depo 20:12-21:13.

11. Tammy responded that if Plaintiff had been paying attention, he would have seen that he walked past it coming into the store. Ex. 2, Pltf's Dep. at 24.

**RESPONSE:** Controverted, based on the following:

11a. Instead of following Dollar General's non-discrimination policy that required McCormick to greet Plaintiff when he entered the store and to walk Plaintiff to the product he was asking to locate, McCormick instead failed to greet Plaintiff and in response to Plaintiff's inquiry, told him, "That if [he] was paying attention, [he] would have seen [he] walked right past it coming

in the door." Plaintiff did notice the cashier's name tag, which read, "Tammy." Ex 4 - Plaintiff Depo 24:7-21.

11b.    *See also* paragraphs 10a-10d, *supra.*

12.    Plaintiff then proceeded to grab a bag of charcoal from the grill rack and brought it to the register to pay for it. Ex. 2, Pltf's Dep. at 25, 27.

**RESPONSE:** Uncontroverted.

13.    Plaintiff does not know what brand of charcoal he picked up, nor does he know the weight of the bag. Ex. 2, Pltf's Dep. at 32-33.

**RESPONSE:** Controverted, based on the following:

13a.    Plaintiff viewed four bags of charcoal purchased by counsel to assist him in refreshing his recollection. Recording made but not maintained.

13b.    Declaration.

14.    Plaintiff never made any attempt to actually look for or purchase lighter fluid. Ex. 2, Pltf's Dep. at 33-34 and 38.

**RESPONSE:** Controverted, based on the following:

14a.    After being directed outside to the grill rack by Lead Sales Associate McCormick as the place to find the charcoal and lighter fluid, Plaintiff looked but did not see any lighter fluid on the outside display. Ex 4 - Plaintiff Depo 25:6-21.

14b.    As explained by Store Manager Sharp, there may not have been lighter fluid to look for on the outside grill rack, because at Store 2605 lighter fluid was not placed on the Grill Rack after incidents where someone sprayed lighter fluid on the side of the building. "Wasn't actually the planogram, but you tried to get as close as you can." Ex 6 - Sharp Depo 36:19-37:12; 38:8-24.

15.     After grabbing the bag of charcoal, Plaintiff brought it to the cash register, at which point Tammy rung up the item, indicating it was $10.00.  Ex. 2, Pltf's Dep. at 27 and 34.

**RESPONSE:**  Controverted, based on the following:

15a.     McCormick did not "indicate" the price, the cash register showed Plaintiff the price of the charcoal as McCormick scanned it in.  Plaintiff then saw the price of $10.00 which did not match the sign of $5 on the outside display.  Ex 2 - McCormick Depo 59:22-60:19; Ex 4 - Plaintiff Depo 27:17-28:10; Ex 35 - Plaintiff Declaration, ¶ 7.

15b.     When the charcoal was scanned in, there would have been a record of the transaction as McCormick would have had to void the transaction with her key.  Ex 6 - Sharp Depo 32:21-33:7.  No such record of the transaction has been produced in this litigation.

16.     Plaintiff responded that the price was $5.00, to which Tammy responded that it was not and that she could not override the price.  Ex. 2, Pltf's Dep. at 27-28.

**RESPONSE:**  Controverted, based on the following:

16a.     McCormick claimed in a recorded conversation that, "Kingsford won't let us override it.  Someone had already been in here earlier for it." Ex 33 - Exhibit B, Line 33.

16b.     McCormick claims she "tried" to override the price for Plaintiff but could not and "ended up calling my assistant manager because he was getting agitated with me," and "she even told me I couldn't even override it."  Ex 2 - McCormick Depo 56:9-57:6. McCormick's claim that she called her Assistant Store Manager, Karen Schlosser, is contracted by Schlosser.  Ex 5-Schlosser Depo 20:22-23:13.

16c.     Plaintiff never saw McCormick pick up the phone to make any call while he was present and never saw Tammy put any key into the register when he was present. Ex 35 - Plaintiff's Declaration, ¶ 9.

16d.    Adjusting the price would involve placing McCormick's key into the register. Assistant Manager Schlosser explained that Dollar General had a practice it expected its cashiers and lead cashiers to follow, where the key carrier including lead cashiers such as McCormick could place their key into the register and override the price that was rung up, void the sale and manually enter the price, a process that took about 10 seconds or less to accomplish.  Ex. 5 - Schlosser Depo 24:22-25:20.  Since Assistant Manager Schlosser knew that McCormick had her keys with her on September 17, 2017, McCormick should have been able to override the price on the charcoal that day  Ex. 5 - Schlosser Depo 25:21-26:20.

17.    Plaintiff then responded by telling Tammy that she was being rude, at which pointed a "heated" exchange then took place between them.  Ex. 2, Pltf's Dep. at 27-28.

**RESPONSE:**  Controverted, based on the following:

17a.    Plaintiff told McCormick that the price outside said they were $5 -- "It had a big 5 on it, you know, a Dollar General 5…on the rack, and I told her that it was $5, and she told me that it's not and she couldn't override it, and then I told her she was being rude and that the prices outside were right…"  Ex 4 - Plaintiff Depo 27:17-28:10.

17b.    As explained in paragraph 10.d., *supra,* Dollar General policy expected McCormick to have walked Plaintiff to the product he was looking for, to have greeted him initially and to have contacted a manager to assist in any resolution, if needed, none of which McCormick followed.  Ex 10- Watson Depo 19:11-21:13; Ex 27 - Deposition Exhibit 37, DGRimson bate-stamped pages 161-66, 176, 188, 195, 202, 207.

17c.    McCormick admits to ordering Plaintiff to leave the store several times.  Ex 2 - McCormick Depo 62:16-63:2.

17d.     McCormick claimed that while Plaintiff still present in the store, she had a phone call with Assistant Store Manager Schlosser and claims she was instructed by Schlosser to hang up and call the police if Plaintiff did not leave in the next ten minutes.  Ex 2 - McCormick Depo 62:20-63:2.  A jury could conclude McCormick's claim to having asked for help from Assistant Store Manager Schlosser while Plaintiff was present is false, as the sole phone call Schlosser had with McCormick after Schlosser's shift ended at 5:00 p.m. on September 17, 2017 occurred in the evening and the call related to events that occurred after Plaintiff had already left the store. Ex 5- Schlosser Depo 20:22-23:13.  *See also* paragraphs III.18a-18l, *infra*.

18.     While Plaintiff could have purchased the charcoal he picked up for $10.00, Plaintiff instead left the store without purchasing anything at the East 23rd Street store.  Ex. 2, Pltf's Dep. at 17, 29 and 37.

**RESPONSE:**  Controverted, based on the following:

18a.     McCormick did not explain to Plaintiff about differences in the brands of charcoal or which ones were or were not one sale, but after Plaintiff questioned the price he was being charged, McCormick told Plaintiff she could not override the price to make it $5 and told Plaintiff if he didn't want the bag he could go somewhere else and get it, throwing the bag of charcoal that Plaintiff had brought to the counter that had been scanned in for purchase, onto the floor. McCormick then told Plaintiff to get his black ass out the store.  Ex 4 - Plaintiff Depo 27:17-28:10, 34:7-35:10; Ex 35 - Plaintiff Declaration, ¶¶ 7-9.  McCormick admits she told Plaintiff if he wanted to buy the charcoal at the price he was asking for he needed to go somewhere else, claiming she did this "because I didn't have to take his attitude."  Ex 2 - McCormick Depo 94:7-23.

18b.     McCormick inconsistently and falsely claimed 1) she threatened Plaintiff, while he was in the store, "I'm gonna call my assistant manager up here."  Ex. 32, Exhibit B (Transcript of

Recording), lines 50; 2) in a written statement, not just threatened but did call her manager:   "…
so I called [Assistant Manager] Karen and asked her what I should do about someone not leaving
after I asked them to leave.  So while I was on the phone with her he finally left the store…" Ex.17,
Deposition Exhibit 23; and 3) in her deposition, repeated her claim that she actually called her
assistant manager while Plaintiff stood at the counter and received the instruction that she should
hang up and call the police if Plaintiff did not leave the store in the next ten minutes.  Ex 2 -
McCormick Depo 62:20-63:2.

18c.    Assistant Store Manager Schlosser, however, contradicts all three of McCormick's
versions that McCormick called her while Plaintiff was present.  In fact, in the single phone
conversation Schlosser had with McCormick on September 17, 2017, McCormick described
events that occurred only much later after Rimson had already left Store 2605 and when his mother,
Juanita Tucker, later recorded McCormick about an hour after Plaintiff had left.  Assistant Store
Manager Schlosser testified the single telephone conversation with McCormick on September 17,
2017 included McCormick recounting to her about McCormick's <u>later</u> interaction with Rimson's
mother.  Ex 5 - Schlosser Depo 20:22-23:13.

18d.    McCormick told Plaintiff to get his black ass out the door after telling him he could
go elsewhere to purchase charcoal, and Plaintiff responded with curse words.

18e.    McCormick then looked back at some employees saying, "fucking niggers," the N-
word in front of customers, all of whom were white.  Ex 4 - Plaintiff Depo 29:8-15.

18f.    While McCormick denied she ever called Plaintiff (nor anyone else in her entire
life) the N-word, McCormick admits only to calling Plaintiff "an African American" and claims
she told Plaintiff, "Please leave, African American" at least 10 times within the hearing of all the
customers who were present.  Ex 2 - McCormick Depo 92:8-93:24. McCormick testified she said,

"African-American" to Plaintiff because she did not know Plaintiff's actual name.   Ex 2 - McCormick Depo93:1-21.

18g.    McCormick only threatened to call the assistant manager but did not do so, and Plaintiff told her to call the manager.   Ex 4 - Plaintiff Depo 31:8-15; Plaintiff Declaration, ¶ 9. McCormick never placed her key into the register as would be necessary had she attempted to adjust the price as claimed.   Nor did McCormick ever make any phone call to any manager while Plaintiff was present in any attempt to resolve Plaintiff's concerns over price, as Dollar General's customer service training directed.   Ex 35 - Plaintiff Declaration, ¶ 9; *see* Paragraph 10.d, *supra.*

18h.    McCormick provided no receipt, according to her account, "because he was arguing with me and I wasn't taking his attitude, and I was always told not to take an attitude from anybody," a directive she testified had come down from management.   McCormick admits telling Plaintiff several times she did not have to take his "attitude and to leave the store."   Ex 2 - McCormick Depo 61:21-25; 62:12; 62:16-63:2.

18i.    McCormick had the authority to adjust a price on an item by using her key with the cash register and when she was the only one in the store, she did not have to obtain anyone else's approval to do so, if she is the only one there and is there in a management position as a key carrier, "You would take care of the customer at that point."   Ex 6 - Sharp Depo34:8-35:4. Imari had seen McCormick make adjustments to prices, using her store key.   Ex 3 - Ray Depo 59:1–60:17.

18j.    Assistant Manager Schlosser explained that Dollar General had a practice it expected its cashiers and lead cashiers to follow, where the key carrier including lead cashiers such as McCormick could place their key into the register and override the price that was rung up, void the sale and manually enter the price, a process that took about 10 seconds or less to accomplish.

Ex 5 - Schlosser Depo 24:22-25:20. Since Assistant Manager Schlosser knew that McCormick had her keys with her on September 17, 2017, McCormick should have been able to override the price on the charcoal that day Ex 5 - Schlosser Depo 25:21-26:20.

18k. When a customer comes to the checkout counter, the first thing is for the cashier to scan the item, and the price shows up for the customer to see. Ex 6 - Sharp Depo30:13-25. Although the charcoal was scanned in, McCormick would have had to void the transaction with her key. Ex 6 - Sharp Depo 32:21-33:7.

18l. Defendant's statement in paragraph 18 is not supported by its cited record (page references only), overlooks the above testimony and, at best, represents only inferences that Dollar General hopes will be improperly construed in Dollar General's favor as the moving party. On page 17, Plaintiff only admits he did not end up purchasing any charcoal "at that store," Ex 4 - Plaintiff Depo 17:12-15, but did go to an entirely different store to make a purchase of charcoal. Ex 4 - Plaintiff Depo 18:1-18; Deposition Exhibit 1. On page 29, Plaintiff testifies that he left the store solely manned by Tammy McCormick, without making his intended purchase of charcoal, not knowing what to do and called the police to report the racially discriminatory treatment he experienced, and he did call the police outside in his car. Ex 4 - Plaintiff Depo 29:8-15.

19. Plaintiff never saw any white customers charged $5.00 for the same type of charcoal that he was told was $10.00. Ex. 2, Pltf's Dep. at 35-36.

**RESPONSE:** Uncontroverted that Plaintiff did not see any white customers charged $5.00 for the same type of charcoal he was told was $10.00. Controverted regarding whether other customers had issues with McCormick over pricing and that she treated minorities differently than white customers and differently than Dollar General policy and practice.

19a.    On September 17, 2017, by the time Plaintiff arrived at the store, McCormick testified that she had already had an issue with a customer, whose race was described as "Mexican," who had asked for a change in price on another item (not charcoal) and had asked for the sales price on an item not on sale.  Ex 2 - McCormick Depo53:9-54:19.  When asked by defense counsel, McCormick changed the story to describe event of September 17, 2017 when a Mexican customer tried to purchase Kingsford charcoal that she thought was on sale, was told otherwise, and she went and got the charcoal "that was on sale."  Ex 2 - McCormick Depo 110:22-20.

20.    The East 23rd Street store in fact did not sell a single bag of charcoal of any kind on September 17, 2017 for $5.00.  Ex. 3, Snow Decl. at ¶ 7.

**RESPONSE:**  Controverted to the extent the statement is intended to infer there were no bags of charcoal offered for sale for $5 on the outside grill rack on September 17, 2017, the inference of which is disputed, based on the following:

20a.    McCormick stated that the Dollar General brand was on sale for $5 on September 17, 2017.  Ex 2 - McCormick Depo 109:9-20; 110:22-20.

20b.    *See* paragraphs 24a-24d, *infra.*.

21.    Plaintiff subsequently went to another Dollar General store located on Highway 24 in Independence, Missouri (the "Highway 24 store").  Ex. 2, Pltf's Dep. at 18.

**RESPONSE:**  Uncontroverted.

22.    At the Highway 24 store, Plaintiff purchased a bag of the Dollar General brand of charcoal for $4.50 plus tax.  Ex. 2, Pltf's Dep. at 18-19.

**RESPONSE:**  Uncontroverted that not from any outside grill rack, but from the inside of the Highway 24 store, Plaintiff purchased a bag of Dollar General brand of charcoal for $4.50 plus tax.  Plaintiff further states:

22a.  The charcoal at the Highway 24 store was not located outside the store on any grill rack but was located inside the store.  Ex 4 - Plaintiff Depo 40:14-41:4. The planogram presented to explain the products on the grill rack at Store 2605 would not explain the products actually being offered for sale at Store 2605 on September 17, 2017.  *See* ¶¶ 5a - 5l, *supra.*

23.      Plaintiff does not know whether the bag of charcoal he purchased at the Highway 24 store was the same type as the bag he attempted to purchase at the East 23rd Street store.  Ex. 2, Pltf's Dep. at 42-43.

**RESPONSE:**  Controverted, based on the following:

23a.      Plaintiff only testified at the time of his deposition that he did not **remember** whether the charcoal purchased at the second Dollar General store was or was not identical to the charcoal that he selected at Store 2605.  Ex 4 - Plaintiff Depo 40:25-41:4.  Because the product purchased at the second Dollar Store located on Highway 24 store was not on an outside grill rack, there is no foundation to support that one would expect to see the same charcoal sold inside a Dollar General store as that sold on the grill rack.

23b.      After having reviewed the brands and different sizes of bags of charcoal purchased by his attorney at the inspection of premises in this lawsuit, Plaintiff recalled that on September 17, 2017, he selected the smallest size bag of Kingsford charcoal on the outside display rack that day, with the weight of between 4 and 5 pounds, basically the amount of charcoal for a one-time use since he was bringing the charcoal to his brother's house.  He recalls the brand of charcoal selected was Kingsford.  Ex 35 - Declaration of Plaintiff, ¶¶ 4-5; Ex 36 - Declaration of Marie Gockel, ¶ 2.

24.      Plaintiff never saw any advertisements or fliers advertising charcoal products at Dollar General for $5.00.  Ex. 2, Pltf's Dep. at 64.

**RESPONSE:** Controverted, based on the following:

24a.     Plaintiff observed the grill rack and the presence of a "big yellow 5" colored sign advertising in the Dollar General black and yellow colors the price of $5, sitting on top of the rack, with charcoal located below on the grill rack, on the sidewalk outside of the Dollar General store 2605.  Ex 4 - Plaintiff Depo 21:24-22:16; 27:17-28:10; 33:7-10.

24b.     McCormick admitted that at Store 2605 on the outside grill racks on September 17, 2017, there was charcoal items for sale for $5 -- claims the sale was the Dollar General brand charcoal items**.**  Ex 2 - McCormick Depo 109:9-20

24c.     Lost tags from the outside racks were replaced from a large cardboard box of tags that were used for anything on sale.  These were yellow with black numbers on them, such as 1, 1.50, 2, 2.25, and there was a tag for $5.  The store lingo used for it was "Go get a price."  The tags were paper so they were taped on the rack.  The tags could be used interchangeably for different products. Ex 3 - Ray Depo 57:1–58:25.

24d.     Plaintiff further incorporates the responses made in ¶¶ 5a-5l and 9a-9g, *supra,* as further response to Defendant's paragraph 24 herein.

## IV.     PLAINTIFF'S STATEMENTS OF ADDITIONAL MATERIAL FACTS FOR JURY RESOLUTION

### A.     Coverage of Dollar General Retail Stores Under the MHRA.

1.     Dollar General offers goods for sale to the general public in over 8,000 retail stores in 35 states, including 317 retail stores in the State of Missouri.  Ex.29 - Deposition Exhibit 39, bate-stamped page 000279 (p. 2.7/39); Ex 10 - Corporate Representative Deposition (Jennifer Watson) 37:25-38:10.

2.     The Missouri Commission on Human Rights issues a mandatory poster which specifically includes retail stores, along with others, in the MHRA definition of "places of public

accommodation." https://labor.mo.gov/sites/labor/files/pubs_forms/MCHR-7-AI.pdf; The mandatory poster from this website is set forth in Court Document Ex. 32 - Exhibit A.

**B.**     **Duties and Responsibilities of Lead Sales Cashier Tammy McCormick.**

3.     In January 2017, Dollar General's Store Manager Dale Sharp hired Tammy McCormick as a Sales Cashier for Store 2605 and then one month later, promoted her to the position of Lead Cashier, the position she occupied for the remainder of her employment through December 23, 2017. Sharp hired McCormick and then promoted her to a part-time lead position because he "needed a key carrier to be able to run some of the day to day shifts." Ex 2 – Tammy McCormick Depo 9:7-11:19; 12:17-24; Ex 6 - Dale Sharp Depo 20:6-21:1.

4.     It was typical that the highest position in the store for some period of the day would be the Lead Sales Associate, during which the Lead Associate would have the same responsibilities as the Store Manager overseeing the entire operation of the store. Ex 6 - Sharp Depo 25:18-26:15.

5.     According to the Dollar General Job Description for the position, the Lead Sales Associate "performs the duties of a Sales Associate and acts in a lead capacity in the absence of the Store Manager or Assistant Store Manager." Ex 20 - Deposition Exhibit 27; Ex 6 - Sharp Depo 21:16-25; 23:12-22.

6.     District Manager Gregory Young described the position of Lead Sales Associate as "entry level management." Ex 11 - Young Depo 32:6-9.

7.     Upon promotion from Sales Associate to a Lead Sales Associate, McCormick understood she had management responsibilities, became a "key holder," and could "do what the managers were able to do." Consistent with statements set forth in the written job description for the position of Lead Sales Associate, in the absence of a store manager or an assistant store manager being present at the store, she was effectively the manager. As a key holder, McCormick

carried keys for the registers and store doors and was authorized to take returns and count the draws down for the night. Ex 2 - McCormick Depo 15:13-25; 16:12-17:4; Ex 20 - Deposition Exhibit 27.

8.      On Sunday, September 17, 2017, from 5:00 p.m. to approximately 5:45 p.m., Tammy McCormick was the only Dollar General employee scheduled to and who did work in Store 2605. Ex 13 - Deposition Exhibit 10; Ex 11 - Young Depo 28:4-10; 32:17-23. It was typical for the highest position in the Dollar General store for some period of the day to be the position of a lead sale associate where her responsibilities would be the same as the manager, i.e. to oversee the entire operation of the store. Ex 6 - Sharp Depo 25:4-26:15

9.      As Lead Cashier, Dollar General would schedule McCormick as the only supervisory employee at the Dollar General store and during those times, McCormick was in charge of the non-supervisory employee assigned to work with her. Ex 6 - Sharp Depo 25:18-26:15; Ex 2 - McCormick Depo 19:1-9; 29:5.

10.      When Dollar General's products that were on sale did not ring up properly, a key carrier such as McCormick had the authority and training to adjust the price on the cash register including a 50 and 25 percent markdown with a key. Ex 6 - Sharp Depo 28:24-30:12. As the sole key carrier in the store, McCormick had the authority and ability to use her key and make an adjustment on the price of an item and she would "take care of the customer at that point." Ex 6 - Sharp Depo 34:9-35:4. When a customer sees a posted price of $5 for a bag of charcoal, the customer should be charged consistently with the posted price, after verifying that the charcoal was marked incorrectly by asking the customer to show where the product came from. Ex 11 - Young Depo 85:15-86:9.

11.     McCormick had the authority to adjust a price on an item by using her key with the cash register and when she was the only one in the store, she did not have to obtain anyone else's approval to do so, if she is the only one there and is there in a management position as a key carrier, "You would take care of the customer at that point." Ex 6 - Sharp Depo 34:8-35:4.

### C.     Repeated Prior and Subsequent Racial Slurs by McCormick other than September 17, 2017.

12.     McCormick was typically assigned as the lead cashier to be in charge of the non-supervisory employees, who typically were one of two employees.  Ex 2 - McCormick Depo 19:15-20:7. McCormick and Ray worked together "pretty much most of the time."  Ex 2 - McCormick Depo 20:7-13.  McCormick felt comfortable around Ray, thought the two "got along great," and "never had a disagreement or anything [with Ray]."  Ex 2 - McCormick Depo 20:1-13.

13.     McCormick testified she has never said the word, "nigger" in the 46 years of life, even once.  Ex 2 - McCormick Depo 70:21-71:2; 71:16-23.

14.     Sales Associate Imari Ray witnessed first hand McCormick using the N-word while working at Dollar General on a number of occasions.  Ray heard McCormick call a man, his girlfriend and children the N-word behind their backs.  Ray had also heard McCormick use the N-word in conversation. The word was definitely in McCormick's vocabulary.  Once a customer had to stay late in the store so he could find his cellphone. After he left, McCormick called him a "stupid nigger." Ex 3 - Ray Depo 14:10–16:19; 69:4–72:25.

15.     Ray also heard McCormick and McCormick's fiancé, who frequently visited the store, use racial slurs.  The two would use the N-word in discussing African American customers. Ray considered this offensive.  McCormick also used a racial slur for Mexican customers, but Ray could not recall the word McCormick used.  Ex 3 - Ray Depo 16:20–22:3.

16.    Ray and McCormick worked together on Monday, September 18, 2017 (the day following Plaintiff's encounter).  For a week or two after the incident, usually when only Ray and McCormick were in the store, McCormick would talk to customers about the complaint against her, inconsistently claiming she would never use the N-word but also admitting to having used the slur or that she only could not recall having said the N-word.  Ex 3 - Ray Depo 23:7-25:19; 75:16–77:18.

17.    Ray repeated that she had heard McCormick use the N-word.  When McCormick was accused of using the N-word, she would respond by claiming she had been called a cracker.  One time McCormick was talking at the front of the store to her boyfriend Daniel and she said, "He called me a cracker so I don't see why it's bad for me to call African American people niggers." This was not in reference to Plaintiff Rimson but to someone else. McCormick complained about being called a cracker on other occasions, too.  Ray never actually heard anyone call McCormick a cracker.  Ex 3 - Ray Depo 26:10–28:12; 69:4-72:25.

18.    McCormick used the N-word when talking to frequent customers.  There was a regular customer named Antoine who she called the N-word and not just the day he slashed her tire.  Ex 3 - Ray Depo 28:13–37:16.

19.    Regarding the Rimson complaint, no one at Dollar General ever contacted Ray in relation to any investigation conducted in response to the complaint made by Plaintiff.  Ex 3 - Ray Depo 45:13–49:7.

20.    Ray reported to Assistant Manager Karen Schlosser about McCormick using the N-word.  Ray had no training regarding what to do if she heard someone use the N-word in reference to a customer.  Her only training at Dollar General addressed how to use the cash register. Ex 3 - Ray Depo 69:4–72:25.

21.     Assistant Store Manager Schlosser also has personally heard McCormick use the N-word to refer to African Americans while at work at Dollar General.  Ex 5 - Schlosser Depo 26:25-28:17.

22.     There were times that Ray would follow a customer out the door to apologize for McCormick's rude behavior.  Ray felt that McCormick was never sorry about her behavior, including the incident with Rimson.  Ex 3 - Ray Depo 69:4–72:25.

23.     Ray would ask her managers to not work again with McCormick but was told next time would be okay and it won't happen again.  She heard McCormick using racial slurs when talking to her boyfriend Daniel because his car would be right out front in the parking lot.  Ray could hear because the two would talk loudly outside when McCormick took a smoke break or sometimes McCormick talked to her boyfriend on a speakerphone while stocking the shelves.  Ex 3 - Ray Depo 77:19–80:14.

24.     Each time McCormick used the N-word, Ray let Assistant Store Manager Schlosser know and asked Schlosser to do something about it.  Ray found the N-word offensive because she had African American friends.  The response from Assistant Store Manager Schlosser was that if it happened again, let her know.  Assistant Store Manager Schlosser would try to talk to McCormick but McCormick did not change her behavior.  Ex 3 - Ray Depo 98:13–100:7.

25.     Ray estimated that she had talked to Assistant Store Manager Schlosser regarding McCormick's use of a racial slur from 7 to 10 times over a period of over a year.  Ex 3 - Ray Depo 101:7-19.

26.     Assistant Store Manager Schlosser expressed her hesitancy to report to her Store Manager McCormick's racial slurs because of Schlosser's concerns that McCormick would

somehow point the finger at her and knew that Store Manager Sharp and McCormick had been friends before McCormick's employment with Dollar General.  Ex 5 - Schlosser Depo 30:3-33:5.

27.     McCormick admits believing that sometimes blacks who came into the store tended to "throw their attitudes around," meaning "tried to push me around."  Ex 2 - McCormick Depo 30:13-17.

28.     McCormick denied ever saying that Blacks come in and throw their attitude around, and we've got to stand our grounds and denied saying this to anyone on September 17, 2017.  Ex 2 - McCormick Depo 30:21-31:6.

29.     McCormick denied recognizing her voice and denied saying the words in a video clip when she listened to only a clip, but when she listened to the entirety of the recording, admitted the voice on the recording was her own.  Ex 2 - McCormick Depo 31:7-32:4; 37:13-38:4.  ; Exhibit 19; Transcript of However, when the entire video of the recorded exchange between McCormick and Plaintiff's mother was played for McCormick at the deposition, she relented in acknowledging that she was one of the persons in the video.  Ex 2 - McCormick Depo 37:13-38:4; 38:20-24; Ex 16 - Deposition Exhibit 20.  The exchange reflected on the recording marked as Deposition Exhibit 20 occurred about one hour after Plaintiff left Store 2605.  Ex 2 - McCormick Depo 38:20-39:10.

30.     At the time McCormick spoke to Plaintiff's mother, Juanita Tucker, that was recorded, McCormick did not think anything of it and did not think about whether she wasn't there at the time of the actual incident between Plaintiff and McCormick one hour earlier.  Ex 2 - McCormick Depo 39:19-22.

     D.     **Ineffective Dollar General Policies on Discrimination against Customers**

31.     Dollar General's anti-discrimination and harassment policy (Deposition Exhibit 36) fails to even expressly mention the word, "customers."  Ex 10 - Corporate Representative

Deposition (Jennifer Watson) 10:15-25; Ex 26 - Deposition Exhibit 36; Ex 6 - Sharp Depo 81:19-83:21 (referring to Depo Exhibit 24, pages 2-3, same as Deposition Exhibit 36); 100:1-13.

32. When employees are hired at Dollar General, they are asked to sign a document describing Dollar General's anti-discrimination policy, marked as Deposition Exhibit 36. Ex 10 - Watson Depo 8:24-9:14, 10:15-25; 11:8-12; Ex 26 – Deposition Exhibit 36. The stated policy expresses a "zero tolerance" for discrimination. Ex 26 – Deposition Exhibit 36.

33. Dollar General's antidiscrimination policy (Exhibit 36) contains no specific reporting requirements for supervisors who become aware of discrimination to report the matter up the chain of command. Ex 26 – Deposition Exhibit 36. Employees who are hired and then promoted from Cashier/Associate to Lead Associate and Assistant Supervisor do not undergo any additional training on non-discrimination; only store managers and above undergo such training. Ex 10 – Watson Depo 18:21-19:12; 21:2-13.

34. The policy does state that anyone who witnesses harassment, retaliation or discrimination should immediately report the matter to his or her manager, human resources of the Employee Response Center. Ex 26 – Deposition Exhibit 36.

35. As further detailed in Section IV. C, ¶¶ 12-30, *supra,* Assistant Store Manager Karen Schlosser received multiple reports from Sales Associate Imari Ray related to racist remarks and conduct of Lead Sales Associate Tammy McCormick but failed to ever report Ray's reports to anyone further.

36. Store Managers hired by Dollar General undergo customer service training, called "STAR Training," which was intended as part of Dollar General's non-discrimination training of its store managers, but not required for supervisors such as assistant managers or lead sales associates such as McCormick. Ex 10 - Watson Depo 19:19-22:25; 70:21-71:1.

37. Dollar General conducts no specific training for any of its employees on implicit bias. Ex 10 - Watson Depo 23:10-24; 25:2-11.

38. Dollar General employees are not supposed to use the "N-word" at work and individuals who hear this occur are supposed to report such an exchange up the chain of command, but are only trained in this regard through the sole requirement of signing the non-discrimination policy at the start of their employment. Ex 10 - Watson Depo 25:12-26:15.

39. Store managers only undergo additional computer-based training addressing customer experience, the culture of serving others, the role of store managers, reflected in the computer-based learning module marked Deposition Exhibit 39. However, the Deposition Exhibit 39 does not even address the requirement of non-discrimination of customers by its employees nor Dollar General's non-discrimination policy. Ex 10 - Watson Depo 38:7-25; Ex 29 - Deposition Exhibit 39.

**E.**     <u>**Lack of Full Investigation by Dollar General of Plaintiff's Complaint**</u>

40. Store Manager Dale Sharp denied responsibility for taking any statements in the investigation of Plaintiff's complaint and claims that was the responsibility of District Manager Young to take care of and handle, explaining that Young "knew more about what was going on" than he did. Ex 6 - Sharp Depo 16:3-14.

41. As part of the investigation, no one took statements or talked to McCormick's co-workers to find out whether McCormick indicated racial bias in their experiences with her. Ex 6 - Sharp Depo 56:20-57:10.

42. Sharp prepared a statement (Deposition Exhibit 15) on or after September 21, 2017 but had not actually spoken to Plaintiff. Ex 6 - Sharp Depo 67:17-69:15.

**F.**     <u>**Failure to Preserve Records and Documents.**</u>

43. Plaintiff's mother, Juanita Tucker, met with District Manager Gregory Young and mentioned something along the lines of compensation to Young, which in his mind, spelled a potential lawsuit to him. Young communicated this information to his Regional Director and Human Resource Business partner. Ex 11 - Young Depo 62:14-63:11. Young reviewed the store recordings from its video cameras of September 17, 2017 that were on the CCTV, which were video but not audio, but would have captured the cashier area of the store. Young sent all of the copies of the recordings he made to the corporate offices via certified mail and expressed in his deposition that "counsel for Plaintiff should have such recordings." Ex 11 - Young Depo 64:17-67:16; 79:16-82:10. However, no recordings have been produced in this litigation. Ex 8 – Svebek Depo 30;20-25; 31:15-32:2.

44. The security cameras are set up to record persons coming in and out of the store. Ex 6 - Sharp Depo 52:13-53:16.

45. No recordings of any of the events of September 17, 2017 have been produced in this litigation.

46. Dollar General received a notice that Plaintiff had filed a Charge of Discrimination on November 13, 2017. Ex 10 - Corporate Representative Depo (Jennifer Watson) 72:3-10; Ex 14-Deposition Exhibit 14.

47. Dollar General has a records management policy marked as Deposition Exhibit 34 in effect in September 2017. Ex 8- Corporate Representative Depo (Trish Svibek) 17:20-18:3; 19:16-20; 20:12-16.

**G.** **Termination of Employment of McCormick for Non-Related Reasons**

48. McCormick only received a "final written warning" for the events of September 17, 2017. District Manager Young, who listened to the recording of McCormick, thought

McCormick's conduct rose to the level of a termination of employment rather than a written warning, but deferred to the judgment of human resources. Ex 11 - Young Depo 103:5-24; 105:14-106:13.

49.     Store Manager Sharp terminated the employment of McCormick on December 21, 2017, at the direction of District Manager Gregory Young, because she was involved in a scam where someone phoned in to place money onto gift cards and Dollar General lost approximately $3000. Sharp communicated to McCormick the reason for her termination of employment as the failure to protect company assets in the loss of money at the time she was terminated in December 2017. Ex 6 - Sharp Depo 16:21-19:17; Ex 10 - Watson Depo 72:22-73:2; Ex 11 – Young Depo 103:11-15.

50.     McCormick denies ever being counseled at any time during her employment by anyone regarding how she treats Black customers. Ex 2 - McCormick Depo 43:17-25; 44:1-5.

51.     Dollar General would have completed paperwork reflecting the termination/ separation of McCormick maintained at Store 2605, including paperwork signed by McCormick, that was then provided to corporate following her termination of employment. Ex 6 - Sharp Depo 90:10-91:21; 92:22-93:9.

52.     McCormick's human resources file does not contain any references to her termination of employment, much less the reasons for her termination, except for a code that says, "Failure to Protect Company Assets." Ex 10 – Watson Depo 72:12-73:2.

# V. ARGUMENT

**A.** **Retail Stores are Places of Public Accommodation under the Missouri Human Rights Act and Therefore, Summary Judgment Should Be Denied under Count I.**

Dollar General's retail stores offer or hold out goods to the general public (PSOF III.A, ¶1) and therefore, are places of accommodation within the intended meaning of the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. §§ 213.010(16) and 213.065 (2017).[2] Because Dollar General incorrectly claims retail stores are not places of public accommodation within the meaning of the MHRA as its sole challenge to Count I, summary judgment should be denied.

Mo. Rev. Stat. § 213.065 prohibits discrimination because of race in all places or businesses of public accommodation, as defined by statute, with the following language:

> 1. **All persons within the jurisdiction of the state of Missouri are free and equal and shall be entitled to the full and equal use and enjoyment** within this state of **any place of public accommodation, as hereinafter defined**, without discrimination or segregation because of race…
>
> 2. **It is an unlawful discriminatory practice for any person, directly or indirectly, to refuse, withhold from or deny any other person, or to attempt to refuse, withhold from or deny any other person, any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation**, as defined in section 213.010 and this section, or to segregate or discriminate against any such person in the use thereof because of race…

(emphasis added). The MHRA defines the phrase, "places of public accommodation," contained in Mo. Rev. Stat. § 213.065 in broad fashion to include, **all places or businesses offering or holding out to the general public, goods,** services, privileges, facilities, advantages or accommodations **for the peace, comfort, health, welfare and safety of the general public or**

---

[2] Because the events occurred on September 17, 2017, unless otherwise stated, all references to the MHRA are to the post-SB43 amended version of the MHRA that took effect on August 27, 2017 under Senate Bill 43 (2017). The 2017 amended MHRA did not change the language of the definition of "places of public accommodation" contained in the current § 213.010(16) (2017). *See* Mo. Rev. Stat. § 213.010(15) (2014).

**such public places providing food, shelter, recreation and amusement, including but not limited to…"** Mo. Rev. Stat. § 213.010(16) (emphasis added). The statute continues with a non-exclusive list of examples. § 213.010(16)(a)-(f); *Doe by and through Subia v. Kansas City, Missouri School District,* 372 S.W.3d 43, 48-50 (Mo. App. 2012); *State of Missouri ex rel. Washington University v. Richardson,* 396 S.W.3d 387, 391-96 (Mo. App. 2013). Although § 213.065.3 excludes a limited class of specific facilities as public accommodations, retail stores are not among such express exclusions.

In contrast to the MHRA, Title II of the Civil Rights Act, 42 U.S.C. § 2000a, contains no definition of "public accommodation," much less a definition with the broad encompassing language of Mo. Rev. Stat. § 213.010(16).[3] Defendant hangs its entire hat upon a slice of the MHRA's definition of "place of public accommodation" in § 213.010(16)(b) and the interpretation of 42 U.S.C. § 2000a(b)(2) by federal courts. Plaintiff must underscore that his Petition (Complaint) does not assert a cause of action under 42 U.S.C. § 2000a. Federal courts have interpreted the failure by Congress to enumerate retail stores in 42 U.S.C. § 2000a(b)(1)-(4), except in the narrow circumstances where a retail store has eating facilities for consumption of food on its premises, as expressed in § 2000a(b)(2), as evidence that Congress intended retail stores in general (ones without such eating facilities) to be excluded entirely from the reach of 42 U.S.C. §

---

[3] 42 U.S.C. § 2000a(b)(1)-(4) sets forth in specified enumerated categories the intended reach of the prohibitions by stating, "Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action," and then enumerates the specific four categories of covered facilities, one of which is "any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station." 42 U.S.C. § 2000a(b)(2).

2000a.  The same conclusion, however, is not justified by the non-exclusive and broad language

chosen by the Missouri General Assembly, absent from the federal statute, with respect to the

prohibitions against discrimination in public facilities, such as retail stores, that offer or hold out

goods to the public, as set forth in § 213.010(16) of the MHRA.[4]

Defendant's argument ignores the opening language of the MHRA definition in §

213.010(16), ignores the interpretation by the Missouri Commission on Human Rights (MCHR)

of the inclusion of retail stores in the definition of public accommodations (PSOF, § III.A, ¶ 2,

Exhibit A), ignores Missouri appellate decisions interpreting the MHRA's public accommodation

provisions in analogous contexts and ignores the appropriate construction to be given the MHRA

as a remedial statute.

The MCHR publishes on its website mandatory posters expressly spelling out retail stores

as one of several examples of "places of public accommodations" prohibited from discriminating

on the basis of race under § 213.065.   https://labor.mo.gov/sites/labor/files/pubs forms/MCHR-7-

AI.pdf; (PSOF, § III.A., ¶ 2, Exhibit A).  By Missouri regulation, "Every person subject to the

jurisdiction of the commission under Chapter 213, RSMo (1986) shall post the commission public

accommodation poster in all places of business and establishments subject to this statute."  8 C.S.R.

§ 60-3.010(3).   The interpretation by the MCHR of laws it is required to enforce is entitled to

great deference under Missouri law.  *See Pollock v. Wetterau Food Distribution Group,* 11 S.W.3d

754, 766 (Mo. App. E.D. 2000) (regulations have the force and effect of laws).  The MCHR

obviously does not agree with Dollar General's interpretation of the MHRA.

---

[4]     As further explained, *supra,* the Eighth Circuit **_overruled_** the only federal district court to
address the issue of the MHRA's applicability to retail stores under § 213.065 yet Defendant
continues to rely on the district court's overruled opinion in its argument.  *Gregory v. Dillard's,
Inc.*, 565 F.3d 464, 477 (8th Cir. 2009).

No Missouri appellate court has yet had occasion to directly address whether a retail store is included as a place of accommodation under § 213.065.  In  an analogous case, however, *State of Missouri ex rel. Washington University v. Richardson,* 396 S.W.3d 387, the Missouri Court of Appeals held that a private university is a place of public accommodation within the meaning of the MHRA since it offers or holds out services to the general public, applying the broad opening language of the definition of Mo. Rev. Stat. § 213.010(16) upon which Plaintiff relies.  396 S.W.3d at 394-95.  *Richardson* examined the plain meaning of the statutory language, including its listing of non-exhaustive examples, and its intended breadth and noted the lack of any exclusions for academic institutions when the MHRA used "specific enumerated exclusions" to express the intent of excluded public facilities in § 213.065.3.  396 S.W.3d at 396.

The Missouri Supreme Court reached the same result as in *Richardson*, but with a different route, with respect to whether <u>public</u> school facilities were within the intended scope of public accommodations prohibitions under the MHRA.  *R.M.A. v. Blue Springs R-IV School District,* 568 S.W.3d 420, 429-30 (Mo. Banc 2019) (holding that a school district is a "person" subject to the public accommodations provisions of §§ 213.065 and 213.010(16) of the MHRA, even though schools are not specifically enumerated in the definition of "person," referring to the word "including" in § 213.010(16) and the clearly manifested intent by necessary implication).  *See also Subia v. Kansas City, Missouri School District,* 372 S.W.3d 43, 48-50 (holding that a public school is included as a public accommodation under the MHRA).

Missouri courts have made clear that the MHRA's public accommodations provisions under §§ 213.065 and 213.010(16) are intended to be construed broadly to achieve its broad remedial purpose of prohibiting discrimination in the interest of the public good.  *Missouri Commission on Human Rights v. Red Dragon Restaurant, Inc.,* 991 S.W.2d 161, 167 (Mo. App.

W.D. 1999) (applying the public accommodations prohibitions to persons associated with a disabled restaurant patron despite the lack of any express inclusion at the time in the MHRA's language for associational discrimination); *Richardson,* 396 S.W.3d at 392-93 (MHRA "must be interpreted 'liberally to include those cases which are within the spirit of the law and all reasonable doubts should be construed in favor of applicability to the case'" [citations omitted]).  *See also R.M.A. v. Blue Springs,* 568 S.W.3d at 429; *Subia,* 372 S.W.3d at 47-48.  Dollar General does not even cite to *Richardson, R.M.A.* or *Subia* in its briefing, much less attempt to reconcile the interpretations of the MHRA with its rationale asserted in its motion.  The identical language in Mo. Rev. Stat. § 213.010(16) examined in *Richardson* in relation to the offering or provision of *services* to the general public by a private university applies with equal force to the offering or provision of *goods* to the general public by a retail store.

As the case of schools and universities in *Richardson, R.M.A.* and *Subia,,* the fact that retail stores are not expressly enumerated in § 213.010(16)(a)-(f), nor the fact of their mention in the context of the inclusion of eating facilities in § 213.010(16)(b), does not reflect the Legislature's full intent.  Instead, the entirety of the language of §§ 213.065 and 213.010(16) is to be read in harmony.  In *R.M.A.,* referencing the public accommodations prohibitions of the MHRA, the Missouri Supreme Court has instructed that the meaning of MHRA provisions:

> …are not read in isolation but construed together, and if reasonably possible, the provisions will be harmonized with each other.   In determining the intent and meaning of statutory language, the words must be considered in context and sections of the statutes *in pari materia,* as well as cognate sections, must be considered in order to arrive at the true meaning and scope of the words.

*R.M.A.,* 568 S.W.3d at 429 (citations omitted).  In non-MHRA contexts, Missouri courts have also expressed that in construing statutes, "each word, clause, sentence and section of a statute should be given meaning." *Missouri Property & Casualty Insurance Guaranty Association v. Pott*

*Industries,* 971 S.W.2d 302, 305 (Mo. Banc 1998). The corollary rule instructs that "a court should not interpret a statute so as to render some phrases mere surplusage." *Middleton v. Missouri Dep't of Corrections,* 278 S.W.3d 193, 196 (Mo. Banc 2009).

Moreover, as expressed in *Red Dragon, Subia* and *Richardson,* in interpreting the MHRA, any doubts should be resolved in favor of coverage, not exclusion, in light of the broad remedial purposes of prohibiting discrimination in places of public accommodations. *Red Dragon,* 991 S.W.2d at 166; *Subia,* 372 S.W.3d at 48; *Richardson*, 396 S.W.3d at 392-93. The Missouri General Assembly's use of broad, encompassing language, followed by language expressing non-exhaustive examples, plainly expresses the intended reach of the MHRA to retail stores as well as others public facilities meeting the MHRA definition and not expressly excluded. *R.M.A.* 568 S.W.3d at 429-30; *Richardson,* 396 S.W.3d at 396.

Dollar General also claims to point out "the only two courts in Missouri to have addressed the issue of whether a retailer is a place of public accommodation." The first, *Gregory v. Dillard's, Inc.*, 2005 WL 1719960, *6-7 (W.D. Mo. July 22, 2005), is plainly a misdirection because on appeal, the Eighth Circuit <u>reversed</u> Judge Wright's granting of summary judgment on Plaintiff's MHRA public accommodation claim and remanded to the district court with the directive to enter a dismissal <u>without</u> <u>prejudice</u> for the express purpose of allowing a Missouri Court to determine the then novel issue of the intended breadth of its public accommodations claim under Mo. Rev. Stat. § 213.065 of the MHRA. *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 477 (8th Cir. 2009) ("Whether the MHRA, **through the definition of 'place of public accommodation,'** extends to retail establishments is a novel question of state law. Because we conclude that the district court properly dismissed the federal claims, we remand the case with directions to modify the final judgment so as to dismiss the claims under the MHRA ***without*** prejudice, so they may be decided

44

by the courts of Missouri.") (emphasis added). The analysis used by the district court to grant summary judgment on the MHRA claims in *Gregory,* when reversed on appeal, should not be persuasive to this Court. The decision in *Gregory* to remand and direct the dismissal without prejudice of Plaintiff's MHRA case certainly reflects the recognition by the 8th Circuit that the relevant language of the MHRA defining public accommodations is materially distinct from 42 U.S.C. § 2000a.

*Xiaohong Zhang v. Home Depot USA, Inc*., 2017 WL 6039549, *2 (E.D. Mo. Dec. 6, 2017), likewise does not assist Defendant. In *Zhang,* the Court granted a motion to remand based upon a lack of any federal claims supporting federal subject matter jurisdiction. The court only pointed out that private retail stores are not places of public accommodation under 42 U.S.C. § 2000a(a) and are not state actors justifying federal jurisdiction under 42 U.S.C. § 1983. *Zhang,* at *2. Nothing in the opinion addressed the applicability of the MHRA's public accommodations laws under § 213.065 to retail stores, presumably an issue intended to be left for resolution by Missouri state courts following remand.

Dollar General briefly points out in a footnote *State ex rel. City of Kirkwood v. Smith*, 210 S.W.2d 46, 48 (Mo banc. 1948), inexplicably ignoring the intended construction of the MHRA's public accommodations prohibitions discussed in *Richardson, R.M.A., Subia* and *Red Dragon. Smith* addressed whether a later law authorizing county wide elections was intended to counter the already existing specific statutory authorization for holding a special City election to issue bonds. In contrast, the plain meaning of the MHRA's public accommodations law is understood through

45

long-standing words expressed since at least 1986 when the present-day MHRA was first created. In *Smith,* the Court concluded the two statutes at issue enacted at different times did not actually conflict with one another, leaving no basis to justify the conclusion that the existing authorization for City elections was impliedly repealed by the later statute. 210 S.W.2d at 48. Like *Smith,* there is no conflict to construe between the MHRA prohibitions against discrimination in §§ 213.010(16) and 213.065 for all places or businesses offering or holding out to the general public goods, and the specific but non-exhaustive inclusion of eating facilities, including those in retail establishments, in Mo. Rev. Stat. § 213.010(16)(b).

For these reasons, the Court should deny summary judgment on Count I.

**B.  Dollar General is Not Entitled to Summary Judgment on Count II Because Plaintiff Satisfies the Elements of his Claim under 42 U.S.C. § 1981.**

Plaintiff can satisfy the only element of his Section 1981 claim challenged by Defendant – interference with protected activity by Dollar General – and therefore, summary judgment should be denied.

42 U.S.C. § 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

---

[5]  In 1986, the Missouri General Assembly created the present-day Missouri Human Rights Act by amending Chapter 213 and consolidating and amending into the MHRA three different existing laws:  the Fair Employment Practices Act under Section 296.010, *et seq*., in effect since 1961, which was then repealed, the Public Accommodation Act, in effect since 1965, under Chapter 314, which was also repealed, and the Fair Housing Act, in effect since 1972 that had already been set forth in Chapter 213.  *See* the definition of "public accommodation" as it existed in Mo. Rev. Stat. § 213.010(12) (1986) (L. 1986, S.B. No. 513, § A), attached as Exhibit C, which is identical to the current definition in Mo. Rev. Stat. § 213.010(16) (2017).

In 1991, Congress amended § 1981 to make more explicit the intended breadth of the statute:

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

The elements of a § 1981 contract interference claim include: (1) membership in a protected class, (2) discriminatory intent of defendant, (3) engagement in protected activity, and (4) interference with that activity by the defendant. *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 962 n.3 (8th Cir. 2011); *Green v. Dillard's Inc.,* 483 F.3d 533 (8th Cir. 2007); *Gregory v. Dillard's,* 565 F.3d at 469.  Section 1981 does not apply only to existing contractual relationships; it protects the would-be contractor along with those who already made contracts."  *Gregory,* 565 F.3d at 468 (quoting *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 477, 126 S.Ct. 1246 (2006)).  In addition, nowhere has the 8th Circuit required that Plaintiff present evidence of similarly situated shoppers of a different race treated more favorably than the racially discriminatory treatment experienced by the Plaintiff, as part of the prima facie case or otherwise. *See Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 872 (6th Cir. 2001) (rejecting the requirement of presenting proof of more favorable treatment of similarly situated white customers as part of § 1981 contract interference claim).

Here, Defendant only asserts Plaintiff cannot meet the fourth element of his prima facie case -- whether Defendant interfered with a contractual right of Plaintiff.  No dispute exists the impaired contract right at issue was Plaintiff's attempted purchase of a bag of charcoal, an intended goal of his visit to Dollar General Store 2605 and that Plaintiff made a tangible attempt to purchase the charcoal that day.  *Withers,* 636 F.3d at 963.  "Whether a shopper has taken the 'step toward' completing a purchase, or at what point a shopper's interactions with a merchant ripen into a protected 'tangible attempt to contract' is by definition an intensely fact-based determination."  *Withers,* 636 F.3d at 963.  In making its argument, however, Defendant presents the "intensely

fact-based determination" only in a light most favorable to itself as the moving party and overlooks facts in Plaintiff's favor. *See Williams v. Lindenwood University*, 288 F.3d 349, 355 (8th Cir. 2002) (Denying summary judgment and finding, "The drawing of reasonable inferences from the facts is a function reserved for the factfinder.").

Unlike the facts presented in other cases, in this case, Plaintiff had selected his intended purchase, brought his intended purchase to the counter, the intended purchase was scanned in, Plaintiff pointed out the advertised price differed from the price scanned in, and McCormick dropped the bag on the floor, told Plaintiff he would have to go elsewhere to purchase the charcoal, ordered him to leave and hurled racial epithets at him. Plaintiff did not ever state he did not want to purchase the charcoal. Not knowing what to do, and after having been repeatedly told to do so, he went outside to his car and called the police.

Here, there is plenty of direct and circumstantial evidence that McCormick bore racial animus against him from the moment he walked in the door. Viewed in their proper light, the facts show Lead Sales Associate McCormick, through her words and her actions, thwarted and interfered with Plaintiff's attempt to purchase charcoal at Dollar General Store 2605. Defendant hopes to sanitize the context of the facts by ignoring the direct evidence of racial discrimination by Lead Sales Associate Tammy McCormick, the sole employee of Store 2605 and serving in the position of a management role on September 17, 2017 during the time of Plaintiff's encounter with her.

McCormick, the sole Dollar General employee present at Store 2605 from 5:00 p.m. to 5:45 p.m., approximately one hour after Plaintiff left Dollar General Store 2605 on September 17, 2017, admits to believing (while "not trying to be racist or anything") that "a lot of these people," referring to not all but most Blacks, come into Dollar General and throw "their attitude around,

and we got to stand our grounds."  McCormick admits having the belief that most Black customers of Dollar General have "attitudes," which in her mind means most Black customers "are looking for some reason to fight with somebody," and that such attitudes "instantly give her that same "attitude."  II. Plaintiff's Responses to DSOF ¶ 10a.  McCormick claims "she had attitudes being throwed at her," the majority of which "pretty much" came from Black customers and "That's all I ever deal with in here."  McCormick allows for the possibility that white people also have attitudes at times, but according to her, these are white people who come into the store and act like African Americans.  II. Plaintiff's Responses to DSOF ¶ 10a.

As witnessed by Imari Ray, and the Assistant Store Manager, Karen Schlosser, McCormick has regularly used the N-word to refer to Black customers while at work on numerous other occasions besides the day in question involving Plaintiff.  Afterwards, McCormick talked to Dollar General customers about the September 17, 2017 incident and varied her story between denying she had ever used the N-word, saying she could not recall doing so, and admitting doing so.  Dollar General's "investigation" of Plaintiff's complaint never included talking to any of McCormick's co-workers, including either Ray or Schlosser.

The facts presented in this case are distinct from other cases where courts could point to the intervention of another non-biased employee to prevent what may have amounted to illegal interference in a contractual relationship, justifying a finding of no liability under § 1983.  In *Kirt v. Fashion Bug #3253,* 479 F.Supp.2d 938, 972-76 (N.D. Iowa 2007), the plaintiff was merely browsing the store, looking for an item (pink jeans) to purchase, when she encountered a racially biased sale associate, but another employee intervened to stop the offensive conduct and repeatedly invited the plaintiff in several ways to continue shopping.  The district court found there no

interference with any contractual relationship since the intervention of the non-biased employee made clear the plaintiff would not be thwarted in continuing her shopping if she chose. *Id.*

In contrast, McCormick was solely present on September 17, 2017 and in charge of the store. She only threatened, but never called, any manager, to intervene. McCormick, an entry level manager at Dollar General with essentially no discrimination training, threw Plaintiff's intended purchase on the floor and ordered him to leave, with racial slurs.

Reminiscent of days when "Green Books" were needed to warn Blacks about places where their patronage was not welcome and/or (at the time) could be legally declined, Plaintiff encountered McCormick, who was not shy to express biased racial views about Dollar General's Black customers and the sole person in charge that day, and was forced to travel a different route for his purchase, after having been thrown out of Store 2605 with the added boots of racial slurs. Defendant hopes to re-write the intentions of the 1991 amendments expanding the scope of protection, in arguing that Plaintiff fails to provide proof of any "thwarting" or interference with a contract in this case. Defendant's motion for summary judgment on Count II should be denied.

### C. Dollar General is Not Entitled to Summary Judgment on Plaintiff's Missouri's Merchandise Practices Act Claim under Count III.

Summary judgment should not be granted on Count III because Plaintiff can show the elements claimed missing by Defendant: (a) deceptive advertising of charcoal by Dollar General; (b) the purchase of charcoal by Plaintiff; and (c) an ascertainable loss resulting from the deception, all within the meaning of the Missouri Merchandising Act (MMPA), Mo. Rev. Stat. §§ 407.010, *et seq.*

Under the MMPA, Mo. Rev. Stat. § 407.020,

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…is declared to be an unlawful practice. Any act, use or employment

declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

For an individual to assert a claim under the MMPA, there must be proof of: (1) the purchase of merchandise (2) for personal, family, or household purposes; (3) the suffering of an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the MMPA. *Hess v. Chase Manhattan Bank, U.S.A., N.A.,* 220 S.W.3d 758, 773 (Mo. Banc 2007); *Edmonds v. Hough,* 344 S.W.3d 219 (Mo. App. E.D. 2011); Missouri Approved Instruction 39.01 (Committee Comment A) (2016 Revision)(7th ed.).[6]  The MMPA does not merely codify the common law but is intended to supplement it, removing common law impediments to the proof of fraud and expanding its boundaries. *State v. Shaw,* 847 S.W.2d 768, 775 (Mo. Banc 1993). The MMPA covers "every practice imaginable and every unfairness to whatever degree." *Ports Petroleum Company, Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001).

1.   **Deceptive Advertising by Dollar General.**

Section 407.020 of the MMPA declares unlawful a wide range of acts "in connection with the sale or advertisement of any merchandise in trade or commerce..." including those "committed before, during or after the sale, advertisement or solicitation." *Conway v. Citi Mortgage, Inc,* 438 S.W.3d 410, 414 (Mo. Banc 2014). The MMPA defines, "Advertisement" broadly by both statute and regulation.  Mo. Rev. Stat. § 407.010(1) defines **"Advertisement"** as "**the attempt** by publication, dissemination, solicitation, circulation, or any other means to induce, directly or

---

[6]
   Section 407.025 of the MMPA provides for a private right of action under the MMPA as follows, in relevant part: "Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a civil action."

indirectly, any person to enter into any obligation or acquire any title or interest in any merchandise."  The Missouri Attorney General's regulations on the MMPA further define "advertisement" as follows:

> (A) Advertisement (including the terms advertise and advertising) shall mean any oral, **written, graphic or pictorial statement made by a seller in any manner in the course of the solicitation of business. Advertisement includes, without limitation, any statement or representation** made in a newspaper, magazine or other publication, or on radio or television, including cable, **or contained in any notice**, handbill, **sign**, billboard, banner, **poster, display,** circular, pamphlet or letter, **or printed on or contained in any tag or label which is attached to or accompanies any product offered for sale**.

15 C.S.R. 60-7.010(1)(A) (emphasis added).

The MMPA, Mo. Rev. Stat. § 407.010, *et seq,* an important consumer protection enacted to prevent the dismissal of claims on account of overly meticulous common law remedies, is to be construed broadly to support its fundamental purpose of protecting consumers.  *See State v. Polley,* 2 S.W.3d 887, 892 (Mo. App. 1999); *State ex rel. Nixon v. Estes,* 108 S.W.3d 795, 799-801 (Mo. App. 2003).  For these reasons, the Missouri Supreme Court declared the MMPA to "cover every practice imaginable and every unfairness to whatever degree."  *See Ports Petroleum Company, Inc. of Ohio v. Nixon,* 37 S.W.3d 237, 240 (Mo. banc 2001).

Dollar General's display of charcoal products on a barbecue rack outside Dollar General Store 2605 on September 17, 2017, along with a sign in its yellow/black signature brand colors saying, "$5" above several brands of charcoal, constitutes "advertising" within the meaning of the MMPA.  Mo Rev. Stat. § 407.010(1); 15 C.S.R. § 60-7.010(1)(A).  Construed in its proper light, the MMPA's broad definition of "advertising" easily includes the display by Dollar General Store

2605 on September 17, 2017.[7]   The MMPA is to be construed broadly to support its fundamental purpose of protecting consumers and is intended to allow individuals who purchase merchandise to become private attorney generals to further the intended protection of consumers. *See Polley,* 2 S.W.3d at 892; *Nixon,* 108 S.W.3d at 799-801.

Although not directly challenged by Defendant in its summary judgment motion, it is important to point out that Dollar General's advertising of the display of charcoal also constitutes deceptive practices within the broad meaning of the MMPA, which does not require the common law element of actual reliance or any culpable mental state.   15 C.S.R. § 60.9.020(1) and (2).[8] While a sign stated $5 over the display of charcoal products, with the smallest size Kingsford brand at the top of the display, Dollar General's corporate offices testified that based on the applicable planogram and their corporate records, there was actually no charcoal offered for sale at the price of $5 by Store 2605 on September 17, 2017.  Even if Lead Sales Associate McCormick's version of the facts is believed by the jury that there was a sale of the Dollar General brand of charcoal on September 17, 2017 for $5 at Dollar General Store 2605, the jury may conclude deception because the $5 sign above the Kingsford charcoal misled customers into believing the name brand product was on sale.

---

[7]  Plaintiff asserts the outside charcoal display would be MMPA protected "advertising" even without the yellow/black $5 sign at the top, but the facts for purposes of summary judgment are required to be construed in a light most favorable to Plaintiff.   Plaintiff also points out that Defendant did not produce the grill rack because it no longer exists, when Plaintiff requested to inspect it in this litigation. *See* Ex 36 – Gockel Declaration ¶ 1.

[8]  Under 15 C.S.R. § 60-9.020,

"(1) Deception is any method, act, use, practice, advertisement or solicitation that has the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression.

(2) Reliance, actual deception, knowledge of deception, intent to mislead or deceive, or any other culpable mental state such as recklessness or negligence, are not elements of deception as used in § 407.020.1."

The MMPA provides a cause of action for any deception *or* fraud *or* false pretense *or* false promise *or* misrepresentation *or* unfair practice *or* the concealment, suppression, or omission of any material fact in connection with the sale *or* advertisement of any merchandise. In other words, "[s]ection 407.020 does not merely codify the law of fraud; it expands it." *State v. Shaw,* 847 S.W.2d at 775. And, as stated succinctly by the Missouri Supreme Court, the MMPA covers "every practice imaginable and every unfairness to whatever degree." *Ports Petroleum Company,* 37 S.W.3d at 240. Fraud itself, as defined by the MMPA, "is not limited to common law fraud or deceit and is not limited to finite rules, but *extends to the infinite variations of human invention."* 15 C.S.R. § 60-9.040 (emphasis added).

**2**. **Sale of Charcoal to Plaintiff.**

On September 17, 2017, Plaintiff purchased Dollar General brand charcoal at a second Dollar General store for $4.50, after having been denied the purchase of Kingsford brand charcoal advertised for $5 at Store 2605 and told he would have to go elsewhere if he wanted to purchase charcoal. Defendant's arguments overlook both the deceptive advertisement of the charcoal for $5 when, in fact, Dollar General admits no charcoal was being sold for $5 that day and overlooks that Plaintiff did purchase the Dollar General brand charcoal at the second Dollar General store after being told by Lead Sales Associate McCormick he would need to go someplace else to purchase the charcoal.

In *Conway,* 438 S.W.3d 410, 414, the Missouri Supreme Court pointed out that the MMPA makes the "'act use or employment by any person' of any unfair or deceptive practice done '*in connection with* the sale or advertisement of any merchandise' unlawful," and "the use of an unlawful practice is a violation of the MMPA 'whether committed before, during or after the sale,' so long as it was made 'in connection with' the sale." 438 S.W.3d at 414. Based on this language,

the Court found that the later foreclosure of a loan by non-related purchasers of a loan was actionable even though the fraudulent transaction had occurred earlier with the original lender. As pointed in *Conway,* The MMPA does not expressly set forth what "in connection with" the sale means, but the plain and ordinary meaning of this term may be used. *Id.* Applying its ordinary meaning, Plaintiff's actions in purchasing other charcoal he sought to purchase at the advertised price at Dollar General Store 2605, after being told repeatedly to leave with racial slurs hurled at him, satisfies the minimum required "sale" of a product under the MMPA.

*Bratton v. Hershey Company*, No. 2:16-cv-4322-C-NKL, 2018 WL 934899, *2 (W.D. Mo. Feb. 16, 2018, cited by Defendant, does not assist its argument other than to recite the elements of the private cause of action. However, the issue in *Bratton* was not whether or not a sale occurred in connection with the unlawful acts, but whether the plaintiff's continued purchases of candy products with admitted knowledge that the packaging and sizing included uniformly underfilled or "slack filled" empty space was actionable.

In its Reply, Defendant may point to *Jackson v. Charlie's Chevrolet, Inc.,* 664 S.W.2d 675 (Mo. App. 1984), reversing a favorable jury verdict under the MMPA where no purchase of a vehicle of any kind had ever been proven at trial, because the plaintiff never obtained title to the car as necessary to complete a transfer of ownership under Missouri law. Here, unlike *Jackson,* Defendant cannot say that Plaintiff never purchased charcoal but instead the question is whether the sale was in connection with the illegal MMPA practice. Defendant fails to even address this latter issue in any meaningful way in its motion. Applying the ordinary meaning of the phrase, "in connection with," Plaintiff's later purchase of charcoal at a second store satisfies the requirement of a connection with the unlawful conduct under the MMPA under the facts of this case. *Conway, supra.*

### 3.    __Ascertainable Loss of Money or Property.__

Under the MMPA, a consumer who "suffers an ascertainable loss of money or property" has standing to assert a claim for "actual damages," and/or equitable relief, and attorneys' fees, and punitive damages.  Mo. Rev. Stat. § 407.025.  The consumer is *not* required to "suffer actual damages" in order to bring a claim; the legislature would have defined the standing requirement as "suffer actual damages" had it intended actual damages to be the requisite standing threshold.  To the contrary, "actual damages" is just one form of relief to which a consumer is entitled.  To that end, an "ascertainable loss of money or property" is necessarily broader than "actual damages."

In this case, Dollar General promised consumers through the advertising on its outside grill rack Kingsford Brand charcoal for $5.  Plaintiff's purchase of Dollar General brand charcoal at a different location instead of at the advertised price of Kingsford brand charcoal at Store 2605.  These facts, along with the inconvenience and time to travel to a different store and the emotional distress suffered by Plaintiff as a result of the racially discriminatory treatment by McCormick, is an ascertainable loss in connection with the false advertising of Kingsford charcoal at $5/bag at Store 2605 within the meaning of the MMPA.  Plaintiff did not walk away from the transaction but as instructed by McCormick, had to leave and go to another Dollar General location which had no outdoor grill rack display of any charcoal products, and purchased charcoal in the price range he had been falsely promised at Store 2605 he could purchase the Kingsford brand.  Plaintiff can therefore fulfill this element of the MMPA.

In *Murphy v. Stonewall Kitchen, LLC,* 503 S.W.3d 308, 311 (Mo. App. 2016), cited by Defendant, the Court recognized an ascertainable loss in the Plaintiff's purchase of a cupcake mix advertised as "all natural" that was in fact, not "all natural."  Likewise, Plaintiff's purchase of the Dollar General brand charcoal for $4.50 was not what Dollar General offered – Kingsford brand

for $5.00. Consumers certainly have the right to the advertised price for the advertised brand offered, just as consumers have the right to purchase a "all natural" cupcake mix if advertised as such.

Further, Plaintiff's garden variety emotional distress damages are a compensable "ascertainable loss" damage under the MMPA. *See Lewellen v. Franklin,* 441 S.W.3d 136, 142 (Mo. banc 2014) (citing proof of the stress of being unable to make her loan payments, and Ms. Lewellen's fear that she would go to jail as support for the jury awarded actual and punitive damages). In considering a statute with language very similar to that found in the MMPA, a Connecticut appellate court concluded that:

> …proof of an ascertainable loss does not require quantification of the loss that a CUTPA [Connecticut Unfair Trade Practices Act] claimant has suffered. [T]he words 'any ascertainable loss' ... do not require a plaintiff to prove a specific amount of actual damages in order to make out a prima facie case .... Under CUTPA, there is no need to allege or prove the amount of the ascertainable loss,

*Johnson Electric Company, Inc. v. Salce Contracting Associates, Inc.,* 805 A.2d 735,743 (Conn. App. 2002) (citations omitted); *Hinchcliffe v. American Motors Corporation,* 440 A.2d 810, 815 (Conn. 1981) ("Were we to construe that barrier as a requirement that all plaintiffs show actual damages, any person who bought an item which was deceptively advertised but was actually of a value equal to or greater than the item as advertised would not be able to obtain a rescission under [Connecticut's UDAP].")

A broad construction of "ascertainable loss" is also consistent with the Missouri courts' emphatic recognition that the MMPA is a consumer protection statute requiring liberal construction with the purpose "to preserve fundamental honesty, fair play and right dealings." *State ex rel Danforth v. Independence Dodge. Inc.,* 494 S.W.2d 362, 368 (Mo. App. 1973); *see also State ex rel. Webster v. Areaco Investment Co.,* 756 S.W.2d 633, 637 (Mo. App. 1988); and

*Antle v. Reynolds*, 15 S.W.3d 762, 766 (Mo. App. 2000). Limiting an "ascertainable loss" to a brightline test would undermine the basic tenet that the MMPA "cover every practice imaginable and every unfairness to whatever degree." *Ports Petroleum*, 37 S.W.3d at 240.

Plaintiff's inconvenience is an additional ascertainable loss. *Crank v. Firestone Tire* & *Rubber Co.,* 692 S.W.2d 397, 403 (Mo. App. 1985) ("But, when the inconvenience is coupled with a compensable element of damage, the inconvenience occasioned by the breach may be compensated where it is supported by the evidence and shown with reasonable certainty"). The Plaintiff's time lost is compensable. *Grabinski v. Blue Springs Ford Sales, Inc.,* 136 F.3d 565 (8th Cir. 1998) ("Ms. Grabinski was also entitled to recover other expenses of which there was evidence, including ... time lost from work ... and other costs relating to 'problems arising from the fraudulent transaction'"). *See also Hale v. Basin Motor Company,* 795 P.2d 1006 (N.M. 1990) ([H]igh among the factors motivating legislatures to enact laws such as we are considering today is the frustration experienced by consumers having to run around to straighten out unfair or deceptive trade practices.").

For these reasons, summary judgment on Count III should be denied.

## VI. CONCLUSION

As demonstrated, issues of fact for jury resolution exist precluding summary judgment on each of Plaintiff's three claims, and therefore, summary judgment should be denied.

**BRATCHER GOCKEL LAW, L.C.**

By     /s/Marie L. Gockel
           Marie L. Gockel, Mo. Bar No.:  31208
           Lynne Jaben Bratcher, Mo. Bar No.:  31203
           Antonette M. DuPree, Mo. Bar No.: 70039
           4014 B South Lynn Court
           Independence, MO 64055
           Ph:   (816) 221-1614
           Fax:  (816) 421-5910
           E-Mail:  lynne@bgklawyers.com
                   marie@bgklawyers.com
                   antonette@bgklawyers.com

**ATTORNEYS FOR PLAINTIFF**

I hereby certify that a copy of the foregoing
was electronically filed on this 22nd day
of July, 2019, with the Clerk of the Court
via the CM/ECF system which automatically
transmits a Notice of Electronic Filing to the
following counsel:

Justin M. Dean
Walter M. Brown
Ogletree, Deakins, Nash, Smoak
    & Stewart, P.C.
4520 Main Street, Suite 400
Kansas City, MO  64111
justin.dean@ogletree.com
walter.brown@ogletree.com

/s/Marie L. Gockel
Attorney for Plaintiff